UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MICHAEL H. SUSSMAN, BENNETT
WEISS, MAURY KNIGHT and
DEMOCRATIC ALLIANCE OF
ORANGE COUNTY,

                Plaintiffs,

                                     07 Civ 3793 (CLB)
-vs-                                    ECF Case

BRIAN A. CRAWFORD, GARRISON
COMMANDER and UNITED STATES
MILITARY ACADEMY AT WEST POINT,

                Defendants.
-------------------------------------------------------X

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A.    FINDINGS OF FACT

1.    As a public institution that trains members of the United States Army and attracts political protesters opposed to American foreign policy, the United States Military Academy at West Point recognizes that the First Amendment entitles citizens to stage on-site political protests.

2.    The West Point Military Reservation is located in Orange County, New York. The primary entrance gates are Thayer Gate, which feeds directly into the Village of Highland Falls, and Stoney Lonesome Gate, beyond which is situated thousands of acres consisting of remote military training sites and wilderness.

3.    West Point is not simply a military installation but a college campus and national historic shrine with a large public hotel which is open to the public and used for weddings, conventions and similar affairs. West Point hosts large events such as

games, concerts, speeches and plays that are open to the public and attended by thousands of spectators.  West Point also allows tour buses to bring hundreds, if not thousands, of tourists daily onto the grounds.  Each graduation day, more than 15,000 persons gather at Michie Stadium.  West Point's security personnel are experienced in handling large crowds routinely.

4.    Cadets at West Point have access to a variety of print and electronic media as well as political points of view, including diverse viewpoints in opposition to U.S. foreign policy.  There is no prohibition as to what West Point instructors can teach with regard to issues of war and peace.

5.    However, West Point has never permitted political protests anywhere on the Reservation.

6.    In May 2004, defendants issued a policy governing "protests, picketing, and other similar demonstrations on the West Point Military Reservation." (West Point Speech and Protest Policy, at 1, § 1-1).

7.    At § 1-2(f), the policy reads: "In appropriate cases, the Garrison Commander of the [West Point Military

8.    Reservation] may give express written permission for demonstrations or activity on the West Point Military Reservation property outside the gates adjacent to the installation boarders, only if the procedures outlined below are followed."

9.    However, § 1-2(g) reads: "Any person or persons desiring to protest, picket, or engage in any similar demonstrations on the WPMR must submit a written request through the Provost Marshal and Staff Judge Advocate to the Garrison Commander,

U.S. Military Academy.  The request must be received at least 30 calendar days prior to the proposed demonstration or activity . . ."

10.    Section 1-2(g) does not explicitly prohibit speech in specific areas at the West Point Military Reservation.

11.    The only significant audience for protests and marches at the West Point Military Reservation lies within the gates, where civilians and military personnel go about their business.  The remainder of the Reservation is desolate and isolated.

12.    Plaintiffs are political activists associated with the Democratic Alliance of Orange County who oppose the Bush administration's foreign and domestic policies.

13.    Since May 2004, plaintiffs have protested administration spokespersons who have attended the annual West Point graduation and used the occasion to speak in support of the administration's policies.  On each occasion, approximately 1,000 citizens have staged a non-violent march to the gates of West Point and held a rally thereafter at Veterans Memorial Park in the Village of Highland Falls, New York, approximately three-quarters of a mile from Thayer Gate, one of the entrances to West Point.

14.    Plaintiffs' prior marches and demonstrations in Orange County and, specifically, in the vicinity of West Point, have always been peaceful and orderly.  These events are coordinated in conjunction with other organizations.  There is no evidence or any basis to believe that these prior protests were disruptive or disorderly.

15.    It is critical for plaintiffs to coordinate their events with graduations at this military academy, where Bush administration officials have repeatedly articulated its foreign

policy goals.[1]

16.     In early April 2007, plaintiffs learned that Vice President Richard Cheney would

speak at the annual commencement ceremony at West Point, scheduled for May 26,

2007.  It is foreseeable that the Vice President would use this opportunity to defend

the Bush administration's policies relating to the war in Iraq and other matters of

national controversy.

17.     Determining again to protest the guest speaker at the West Point graduation, on April

16, 2007, on behalf of Democratic Alliance of Orange County, plaintiff Sussman

faxed and mailed a request for written permission to stage a peaceful protest at West

Point commencing at 9:00 a.m. on May 26, 2007.

18.     Sussman sent the letter pursuant to West Point's written procedures governing

permission to engage in protest activity there.  This policy requires applicants to

submit a written request 30 calendar days before the proposed event through the

Provost Marshall and Staff Judge Advocate to the Garrison Commander, U.S. Army.

---

[1] This Court may take judicial notice that, in 2002, addressing West Point graduates,
President Bush outlined a new policy of pre-emptive war, stating:

For much of the last century, America's defense relied on the Cold War doctrines of
deterrence and containment.  In some cases, those strategies still apply. But new threats
also require new thinking.  Deterrence – the promise of massive retaliation against
nations – means nothing against shadowy terrorist networks with no nation or citizens to
defend.  Containment is not possible when unbalanced dictators with weapons of mass
destruction can deliver those weapons on missiles or secretly provide them to terrorist
allies.

We cannot defend America and our friends by hoping for the best.  We cannot put our
faith in the word of tyrants, who solemnly sign non-proliferation treaties, and then
systemically break them.  If we wait for threats to fully materialize, we will have waited
too long.  (www.whitehouse.gov/news/releases/2002/06/20020601-3.html).

(Speech and Protest Policy, at 2 [§ 1-2(g)]).

19.    Under the policy, the applicant must include the following information: (a) name, address and telephone number of the sponsoring person or organization; (b) purpose of the event; (c) number of people expected to attend; (d) proposed date, time, location and duration of the event; (e) proposed means of transportation to and from the West Point Military Reservation and (f) proposed means of providing security, sanitary services and related ancillary services to the participants.

20.    Under the written speech and protest policy, nothing prevents defendants from delaying the written permission to stage the protest march. Each passing day without permission makes it more difficult for plaintiffs to successfully organize and publicize the event.

21.    In his letter, Sussman wrote: "[t]he purpose of our event is to demonstrate against the continued [] American invasion of Iraq on May 26, 2007, the same date and time Vice President Cheney shall address graduating cadets. We expect 1000 people to attend this event. These participants shall gather off-base, at Veterans' Memorial Park in the Village of Highland Falls, New York at 8:30 a.m. The assembled shall then march up to and through Thayer Gate onto the West Point Reservation, past the Hotel Thayer and around the large field which lies in front of the hotel. The protesters shall then march back through the gates and off-campus."

22.    As outlined in Sussman's April 16, 2007 letter, while the graduation ceremony would take place at Michie Stadium at West Point, plaintiff's proposed march would take place approximately a half-mile away, through a small part of the reservation at the

other end of this large campus.

23.    From the vantage point of the proposed march (around the large field near Thayer
Gate and the Thayer Hotel), any view of Michie Stadium – the location of the
graduation ceremony – is completely obscured by trees and a large hill.

24.    The length of the proposed marching route around the field near Thayer Gate is
approximately one mile.

25.    Plaintiffs have taken appropriate measures to ensure that the march will not interfere
with any of West Point's security concerns.  The marchers will not stop their
procession at any time once they enter West Point, and they are not utilizing any
sound system.  They also do not intend to speak or otherwise interact with civilian
or military personnel who may observe the march.

26.    The assembled would be on the Reservation for no longer than one hour.  In addition,
the protesters would arrange for their own security and transportation.

27.    The proposed action on May 26, 2007 would not interfere with morale, public
welfare, loyalty, discipline, order or security.

28.    The security apparatus at West Point is fully capable of accommodating the
thousands of people who will attend the graduation ceremony as well as the
individuals who wish to march that same day.

29.    On May 14, 2007, Garrison Commander Crawford responded to Sussman's April 16,
2007 letter.  Defendant Crawford wrote that West Point has never permitted protests
or demonstrations of any type within the gates of the installation and that
"[p]ermitting protests or demonstrations inside the gates of the installation is

inconsistent with the military mission and can detract from the good order, discipline, security, morale, or loyalty of the Soldiers who are assigned to or work at the installation."

30.   Defendant Crawford's May 14, 2007 letter further states that "I have determined that there is no safe way for up to 1000 people to assemble in any area on the military reservation on May 26, 2007 to protest the appearance of the Vice President of the United States at the graduation ceremony that morning without compromising the safety or our residents, our graduation visitors, and the protesters themselves."

31.   Before drafting the May 14, 2007 letter to Sussman, Garrison Commander Crawford did not contact Sussman or anyone else to inquire about the proposed march and how it could be organized consistent with West Point's security needs.  Nor did the Garrison Commander contact the Chief of Police of the Village of Highland Falls to ask if he was familiar with plaintiffs' prior demonstrations and whether the proposed march on May 26, 2007 would pose any threat of disorder.

**B.     CONCLUSIONS OF LAW**

1.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1434(3) & (4), 42 U.S.C. § 1983 and 1988 and <u>Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics</u>, 403 U.S. 388 (1971).

2.    "The First Amendment affords the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'  Although First Amendment protections are not confined to 'the exposition of ideas,' 'there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs'  This no more than reflects our 'profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'"  <u>McIntyre v. Ohio Elections Commission</u>, 514 U.S. 334, 346 (1994).  <u>McIntyre</u> further recognizes that courts afford heightened First Amendment protection to speech on controversial topics.  <u>Id</u>.

3.    "Any prior restraint on expression comes to this Court with a 'heavy presumption' against its constitutional validity." <u>Organization for a Better Austin v. Keefe</u>, 402 U.S. 415, 419 (1971).  Prior restraints are "generally disfavored under First Amendment law because [they] 'chill[] potential speech before it happens.'" <u>Harman v. City of New York</u>, 140 F.3d 111, 119 (2d Cir. 1998) (citing, <u>inter alia</u>, <u>Southeastern Promotions v. Conrad</u>, 420 U.S. 546, 559 (1975) ("[A] free society prefers to punish the few who abuse rights of speech after they break the law than to throttle them and all others beforehand").  Such policies also "pose risks of 'self-

8

censorship by speakers in order to avoid being denied a license to speak.'" Id.  See also, Beal v. Stern, 184 F.3d 119, 124 (2d Cir. 1999) ("prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights").

4.    The Supreme Court has held that government officials cannot ban speech outright even at non-public fora.  See, Board of Airport Commissioners v. Jews for Jesus, 482 U.S. 569, 575 (1987) ("We think it obvious that . . . a ban [on First Amendment activities at an airport] cannot be justified even if [the airport] were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition on speech"), cited in Huminski v. Corsones, 396 F.3d, 53, 93 (2d Cir. 2004).

5.    "Access to a nonpublic forum may be restricted by government regulation as long as the regulation 'is reasonable and not an effort to suppress expression merely because officials oppose the speaker's view.'"  Board of Airport Commissioners, 482 U.S. at 573.

6.    Defendants' policy and practice of prohibiting any marches or demonstrations inside the gates at West Point is unreasonable and therefore violates the First Amendment. The blanket refusal to grant permits inside the gates, where the marchers can be observed by civilians and military personnel, is comparable to the regulation struck down in Board of Airport Commissioners, 482 U.S. at 574-75, where the Supreme Court observed:

    On its face, the resolution at issue in this case reaches the universe of

9

expressive activity, and, by prohibiting all protected expression, purports to create a virtual "First Amendment Free Zone" at LAX. The resolution does not merely regulate expressive activity in the Central Terminal Area that might create problems such as congestion or the disruption of the activities of those who use LAX. Instead, the resolution expansively states that LAX "is not open for First Amendment activities by any individual and/or entity," and that "any individual and/or entity [who] seeks to engage in First Amendment activities within the Central Terminal Area . . . shall be deemed to be acting in contravention of the stated policy of the Board of Airport Commissioners." . . . Under such a sweeping ban, virtually every individual who enters LAX may be found to violate the resolution by engaging in some "First Amendment activit[y]." We think it obvious that such a ban cannot be justified even if LAX were a nonpublic forum because no conceivable governmental interest would justify such an absolute prohibition of speech.

7.      Just as the no-speech zone in Board of Airport Commissioners violated the First Amendment, West Point's practice of refusing to grant any permits for protest activity or marches is unreasonable under First Amendment as "no conceivable governmental interest would justify such an absolute prohibition of speech." Id. at 575.

8.      West Point merely speculates that protest activity within the gates would create security concerns. However, since West Point has not honored any permit request for protest activity within the gates, it has no concrete way of knowing that plaintiff's May 26, 2007 march would threaten security or good order or implicate any other interest set forth in its speech policy. The government cannot restrict pure political speech on the basis of speculative concerns. Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 498 (1985) (statute restricting political contributions violated First Amendment where "exchange of political favors for uncoordinated expenditures remained a hypothetical possibility and nothing

10

more"); <u>United States v. Nat'l Treasury Employees Union</u>, 513 U.S. 454, 476 (1995) (rejecting ban on public employee speech because "deferring to the Government's speculation about the pernicious effects of thousands of articles and speeches yet to be written or delivered would encroach unacceptably on the First Amendment's protections").

9.    Relatedly, viewpoint discrimination is prohibited even at non-public fora. "Once the government permits discussion of certain subject matter, it may not impose restrictions that discriminate among viewpoints on those subjects whether a nonpublic forum is involved or not ... We have never held that government may allow discussion of a subject and then discriminate among viewpoints on that particular topic, even if the government for certain reasons may entirely exclude discussion of the subject from the forum. In this context, the greater power does not include the lesser because for First Amendment purposes exercise of the lesser power is more threatening to core values. Viewpoint discrimination is censorship in its purest form and government regulation that discriminates among viewpoints threatens the continued vitality of 'free speech.'" <u>Perry Educ. Ass'n v. Perry Local Educators' Ass'n</u>, 460 U.S. 37, 61-62 (1983).

10.    In allowing Bush administration officials to address the cadets at graduation but at the same time disallowing plaintiffs and their organization from protesting U.S. foreign policy at West Point, defendants have engaged in clear viewpoint discrimination. Defendant Crawford's May 14, 2007 letter states that "[p]ermitting protests or demonstrations inside the gates of the installation is inconsistent with the

11

military mission." Explicit reference to plaintiffs' protest activities makes it clear that defendants are discriminating against them on the basis of viewpoint. This violates the First Amendment notwithstanding West Point's designation as a non-public forum. Perry Educ. Ass'n, 460 U.S. at 61-62.

11. In further denying the request, defendant Crawford stated that "I have determined that there is no safe way for up to 1000 people to assemble in any area on the military reservation on May 26, 2007 to protest the appearance of the Vice President of the United States at the graduation ceremony that morning without compromising the safety or our residents, our graduation visitors, and the protesters themselves."

12. This conclusory justification is rejected. Plaintiffs have asserted – and defendants do not deny – that they have peacefully demonstrated at or near the West Point property in the past. There is no indication in Sussman's April 16, 2007 letter that the hour-long march would be in any way disruptive or burdensome for defendants to officiate.

13. Maintaining order during the protest would not interfere with keeping order during the graduation, including ensuring the orderly accommodation of cadets and their families and the arrival and departure of the Vice President. These events can all be accommodated. Plaintiffs propose an event that lasts approximately one hour, far from the graduation ceremony. There is no risk that plaintiffs or anyone associated with their organization would disturb the peace or cause any problems whatsoever. Defendants' conclusory assertions otherwise cannot be squared with the First Amendment.

14.    Protesting at West Point on graduation day is crucial for plaintiffs who desire to publicize their opposition to Bush administration foreign policy at a location synonymous with that policy.  Compare, City of Ladue v. Gilleo, 512 U.S. 43, 56-57 (1994) (noting that the location of political speech is relevant in defining the plaintiff's First Amendment interests and that "[a] sign advocating 'Peace in the Gulf' on the front lawn of a retired general or decorated war veteran may provoke a different reaction than the same sign in a 10-year-old child's bedroom window or the same message on a bumper sticker of a passing automobile").  Indeed, since defendants – through their May 2004 policy – contemplate that protest activity is appropriate at West Point, there can be no argument that plaintiffs should hold their event away from the military reservation.  "[One] is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."  Southeastern Promotions, 420 U.S. at 556.

15.    In addition, the speech policy's omission of any deadline for decisionmakers to resolve permit requests violates the First Amendment.  To protect against the possibility of censorship, the Supreme Court requires that "any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained."  FW/PBS v. City of Dallas, 493 U.S. 215, 227 (1990).  Accordingly, in Lusk v. Village of Cold Spring, 475 F.3d 480, 491-92 (2d Cir. 2007), the Second Circuit struck down a municipal prior restraint which omitted any provision requiring decisionmakers to expeditiously grant or deny a permit application to post political signage.  See also, Harman, 140 F.3d at 120 (striking

down prior restraint on public employee speech which allowed decisionmakers too much time to resolve the speech request, thereby "allow[ing] the agencies to control the timing of the intended speech. By delaying the review process, the employer has the power to destroy the immediacy of the comment on agency affairs, and thus, in many cases, its newsworthiness").

16.     These holdings are consistent with the Supreme Court's longstanding view that expediency and timing represent the essence of First Amendment activity. Any unreasonable delay in granting or denying permission to speak or assemble is unconstitutional. In prior restraint cases, "dissemination delayed may prove tantamount to dissemination denied." Harman, 140 F.3d at 120 (citing Tribe, American Constitutional Law 1042 (2d ed. 1988); Freedman v. Maryland, 380 U.S. 51, 59 (1965) (noting the deterrent effect of delay in the review process)).

17.     West Point's protest and public assembly policy contains no deadline whatsoever for decisionmakers to resolve permit applications. Nothing in this policy prevents decisionmakers from granting the request at the last minute, before permittees could effectively organize and publicize the event or, as in this case, denying the request only nine business days before the scheduled event.

18.     While the Supreme Court has granted military officials greater latitude to restrict speech, those principles do not apply here. In Greer v. Spock, 424 U.S. 828 (1976), the Court held that the Fort Dix Military Reservation could preclude political candidates from leafleting and meeting with service personnel. The Court reasoned that "[t]here is nothing in the Constitution that disables a military commander from

14

acting to avert what he perceives to be a clear danger to the loyalty, discipline, or morale of troops on the base under his command."  Id. at 840.  Similarly, in Brown v. Glines, 444 U.S. 348 (1980), the Court held that the Constitution permitted the Air Force to restrict servicemembers' speech within an Air Force facility consistent with military loyalty, discipline or morale.

19.   While Greer and Brown apply the general rule that "speech that is protected in the civil population may . . . undermine the effectiveness of response to command," Brown, 444 U.S. at 354, that principle is inapplicable here.  Plaintiffs will not interact with cadets or their families, and the proposed march is far from the graduation ceremonies.  Defendants can offer no rational argument that the protest – far removed from the cadets and distinguished guests – would undermine military effectiveness or morale or disturb the peace.

20.   In Greer, the Court noted that its holding did not prevent political activists from arguing in the future that the speech policy was "applied irrationally, invidiously, or arbitrarily."  424 U.S. at 841.  The scenario foreseen in Greer is before us today: in belatedly responding to plaintiffs' request for a permit to march at West Point on May 26, 2007, and in declaring that West Point does not grant requests to hold political marches or demonstrations inside the gates, defendants have arbitrarily and capriciously applied their own speech policy in violation of the First Amendment.

Dated: May 16, 2007

Respectfully submitted,

S/_____
STEPHEN BERGSTEIN
HELEN G. ULLRICH

BERGSTEIN & ULLRICH, LLP
15 Railroad Avenue
Chester, New York 10918
(845) 469-1277
Counsel for plaintiffs